MW

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jhonnatan Brinez Urdaneta, et al., | No.  CV-20-00654-PHX-SPL (JFM) |
| Petitioners-Plaintiffs, | |
| v. | **ORDER** |
| Chuck Keeton, et al., | |
| Respondents-Defendants. | |

Petitioners-Plaintiffs have filed, through counsel, a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and Complaint for Injunctive and Declaratory Relief (Doc. 1) and an Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (Doc. 19), seeking their immediate release from custody due to the health risks associated with the spread of COVID-19 in CoreCivic's La Palma Correctional Center and Eloy Detention Center.  This matter has been fully briefed, and as follows, the Petition will be granted in part.[1]

**I.    Background**

**A.    Coronavirus Disease 2019 ("COVID-19")**

COVID-19, a disease caused by a novel strain of coronavirus (SARS-CoV-2), was declared by the World Health Organization as a global pandemic on March 11, 2020.  As of the date of this Order, in the United States, 1,334,951 individuals have been confirmed

---

[1] Neither party has requested oral argument, and the Court finds this matter suitable for decision as submitted on the briefs without a hearing.  *See* LRCiv 16.1(e).

as positive for COVID-19, of which 11,383 have been confirmed positive in Arizona.[2]

The United States Department of Health and Human Services Centers for Disease Control and Prevention ("CDC") reports that individuals who contract and transmit COVID-19 experience symptoms that range from negligible, with some individuals remaining entirely asymptomatic, to mild, such as fever, coughing, and difficulty breathing, to severe, including acute respiratory distress, severe pneumonia, septic shock, and multi-organ failure, or even death.[3]  The CDC estimates that serious illness or death occurs in 16% of all cases.[4]  Those at high-risk of suffering severe illness or death from COVID-19 include individuals who are 65 years and older, or individuals of any age with underlying medical conditions including chronic lung disease, moderate to severe asthma, a serious heart condition, a weakened immune system, severe obesity, diabetes, chronic kidney disease, or liver disease.[5]

The virus that causes COVID-19 "is thought to spread mainly through close contact from person-to-person in respiratory droplets from someone who is infected."[6]  The incubation period for COVID-19 extends 14 days on average, with a median time of 4-5 days from exposure to symptoms onset.[7]  The CDC recommends that to avoid exposure and transmission, the public should maintain a physical distance of at least six feet from others, wear cloth face covers, frequently wash hands or use hand sanitizer, and disinfect frequently touched surfaces.[8]  High-risk individuals should take additional "special

---

[2] *Coronavirus Resource Center: COVID-19 Dashboard*, Johns Hopkins Univ. & Med., https://coronavirus.jhu.edu/map.html (last accessed May 11, 2020).

[3] CDC *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed May 11, 2020).

[4] CDC *Situation Summary*, https://www.cdc.gov/coronavirus/2019-ncov/summary.html (*last accessed* May 11, 2020).

[5] CDC *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last accessed May 11, 2020).

[6] CDC *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last accessed May 11, 2020).

[7] *See* n.3, *supra*.

[8] CDC *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html (last accessed May 11, 2020).

precautions," such as continue active treatment of their underlying medical conditions, obtain vaccinations against other diseases like influenza and pneumococcal illness, stay home, and remain away from others "as much as possible."[9]

### B.     Detention Facility COVID-19 Guidance

On March 23, 2020, the CDC issued an "Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities" ("CDC Guidance")[10] which "provides interim guidance specific for correctional facilities and detention centers during the outbreak of COVID-19, to ensure continuation of essential public services and protection of the health and safety of incarcerated and detained persons, staff, and visitors." (CDC Guidance at 2.)  The guidance reports there is a heightened risk of transmission of COVID-19 to and among individuals within detention facilities due to, among other things, the number of sources which can introduce them into a facility's population, including detention staff, visitors, contractors, vendors, legal representatives, court staff, and new detainees; the congregate environment in which detainees "live, work, eat, study, and recreate"; and limited medical isolation options, hygiene supplies, and dissemination of accurate information among detainees.  (CDC Guidance at 2.)[11]  For those reasons, the guidance recommends that detention facilities implement specific measures to prepare for potential transmission of COVID-19, to prevent the spread of COVID-19, and to manage confirmed and suspected COVID-19 cases to prevent further transmission and provide treatment.

The guidance states that "[a]lthough social distancing is challenging to practice in correctional and detention environments, it is a cornerstone of reducing transmission of

---

[9] CDC *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last accessed May 11, 2020).

[10] CDC *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities,* https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf (last accessed May 11, 2020).

[11] "People in correctional and detention facilities are at greater risk for some illnesses, such as COVID-19." CDC *FAQs for Correctional and Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html#People (last accessed May 11, 2020).

respiratory diseases such as COVID-19." (CDC Guidance at 4.) It recommends implementing social distancing strategies to increase the physical space between detained persons "(ideally 6 feet between all individuals, regardless of the presence of symptoms)," such as increasing space between individuals in cells, increasing space between individuals in lines and waiting areas; choosing recreation spaces where individuals can spread out and staggering time in those spaces; staggering meals and rearrange seating in the dining hall so that there is more space between individuals; providing meals inside housing units or cells; limiting the size of group activities and increasing space between individuals during group activities. (*Id.* at 4, 11.) It further recommends that facilities should house quarantined individuals who have had close contact with a COVID-19 case, or individuals in medical isolation who are suspected or confirmed positive with COVID-19, in order of preference, separately in single cells or as a cohort, although "[c]ohorting should only be practiced if there are no other available options." (*Id.* at 15-20.)[12] "If cohorting is unavoidable, [facilities should] make all possible accommodations to reduce exposure risk for the higher-risk individuals." (*Id.* at 19.)

CDC Guidance also recommends that facilities implement intensified cleaning and disinfecting procedures and provide education on, and reinforcement of, hygiene practices. (CDC Guidance at 9-10.) Facilities should, among other things, provide adequate supplies to support intensified cleaning and disinfection practices, and "continually restock hygiene supplies throughout the facility." Facilities should provide detainees and staff no-cost access to soap, running water, hand drying machines or disposable paper towels, tissues, no-touch trash receptacles, and alcohol-based hand sanitizer with at least 60% alcohol where security restrictions allow. (*Id.*) The guidance underscores that because the virus can be transmitted from contagious, yet asymptomatic individuals who are present within the facilities, "[b]oth good hygiene practices and social distancing are critical in preventing further transmission." (*Id.* at 8.)

---

[12] "Cohorting refers to the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." (CDC Guidance at 3.)

On April 10, 2020, the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Enforcement and Removal Operations ("ERO"), developed "COVID-19 Pandemic Response Requirements" ("ICE PRR") (Doc. 30-2),[13] which "builds upon previously issued guidance[14] and sets forth specific mandatory requirements expected to be adopted by all detention facilities housing ICE detainees, as well as best practices for such facilities, to ensure that detainees are appropriately housed and that available mitigation measures are implemented during this unprecedented public health crisis."  (ICE PRR at 3.)  It states that facilities "must . . . [c]omply with the CDC's Interim Guidance."  (*Id.* at 5-6, requiring compliance for both dedicated and non-dedicated facilities.)  ICE has also issued "ICE Guidance on COVID-19" along with COVID-19 testing statistics, which it updates daily on its website.  (Doc. 1-2 at 86-91.)[15]

### C.   ICE Detention Facilities in Eloy, Arizona

CoreCivic Eloy Detention Center ("EDC") and CoreCivic La Palma Correctional Center ("LPCC"), both located in Eloy, Arizona, are privately run detention facilities contracted by ICE through Inter-Governmental Service Agreements.  (Ciliberti Decl. ¶ 3; Berger Decl. ¶ 2.)[16]  EDC houses both male and female detainees and has a capacity to house approximately 1,500 individuals.  (Devaraj Decl. ¶ 3; Berger Decl. ¶ 11.)[17]  LPCC

---

[13] *COVID-19 Pandemic Response Requirements*, https://www.ice.gov/doclib/coronavirus/eroCOVID19responseReqsCleanFacilities.pdf (last accessed May 11, 2020).

[14] ICE PRR incorporates by reference and provides hyperlink attachments to preceding ICE guidance specific to detention and COVID-19, as well as CDC guidance, including: ERO Updated Guidance, COVID-19 Detained Docket Review (Apr. 4, 2020); ERO Memorandum on Coronavirus Disease 2019 (COVID-19) Action Plan (Mar. 27, 2020);  Updated ICE statement on COVID-19 (Mar. 18, 2020); ICE National Detention Standards, Medical Care Standard 4.3 (2019), ICE Performance-Based National Detention Standards, Standard 4.3 (2011); ICE Performance-Based National Detention Standards, Medical Care Standard 4-22 (2008); and CDC Guidance, Public Health Recommendations for Community-Related Exposure, Strategies to Optimize the Supply of PPE and Equipment, and Cleaning and Disinfection for Community Facilities.  (ICE PRR at 17-18.)

[15] *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last accessed May 11, 2020).

[16] Declaration of Jason Ciliberti (Apr. 13, 2020) ("Ciliberti Decl.") (Doc. 30-1 at 34-37); Declaration of Captain Luzviminda Peredo-Berger, M.D. (Apr. 13, 2020) ("Berger Decl.") (Doc. 30-1 at 39-42).

[17] Declaration of Monika Sud-Devaraj, Esq. (Mar. 27, 2020) ("Devaraj Decl.") (Doc. 1-1 at 125-126).

is an all-male facility with a capacity to house approximately 3,000 detainees.  (Devaraj Decl. ¶ 3; Ciliberti Decl. ¶ 13.)  Detainees in each facility live in units, commonly referred to as tanks or pods.  The units are comprised of individual cells which house an average of two detainees each, and have, at a minimum, a bunk bed, a sink, and a toilet.  (Acosta Decl. ¶¶ 3, 18; Mahmoud ¶¶ 3-4, 9-10; Ferguson Decl. ¶ 9.)[18]

To date, 1,593 ICE detainees nationally have been tested for COVID-19 and 788 have been confirmed positive.  In LPCC, 52 detainees have been confirmed positive.  In EDC, zero detainees and one staff member has been confirmed positive.[19]

**D.    ICE Protocols in Eloy Detention Facilities**

"Since the onset of reports of . . . COVID-19, ICE epidemiologists have been tracking the outbreak, regularly updating infection prevention and control protocols, and issuing guidance to field staff on screening and management of potential exposure among detainees."  (Ciliberti Decl. ¶ 7; Berger Decl. ¶ 5.)  Pursuant to that guidance, "[f]or both EDC and LPCC, medical staff are screening all detainee intakes when they enter the facilities including travel histories, medical histories and checking body temperatures and have procedures to continue monitoring the populations' health.  Detainees are assessed for fever and respiratory illness, are asked to confirm if they have had close contact with a person with laboratory-confirmed COVID-19 in the past 14 days, and whether they have traveled from or through area(s) with sustained community transmission in the past two weeks.  All new arrival detainees are then placed in isolation from the general population and closely observed for 14 days, regardless of their travel or health history."  (Ciliberti Decl. ¶ 10; Berger Decl. ¶ 8.)  "Each detainee is screened for disabilities upon admission by a Registered Nurse.  Identified disabilities are further evaluated and reasonable accommodations are provided as medically appropriate."  (Ciliberti Decl. ¶ 9; Berger Decl. ¶ 7.)

---

[18] Declaration of Rocío Castañeda Acosta (Mar. 26, 2020) ("Acosta Decl.") (Doc. 1-1 at 128-131); Declaration of Mohamed Mahmoud (Mar. 30, 2020) ("Mahmoud Decl.") (Doc. 1-1 at 133-135); Declaration of Yesenia Ramales (Mar. 30, 2020) ("Ferguson Decl.") (Doc. 1-1 at 137-138).

[19] *See* n.15, *supra*.

"For both EDC and LPCC, those detainees who present symptoms compatible with COVID-19 will be placed in isolation, where they will be tested.  If testing is positive, they will remain isolated and treated.  In case of any clinical deterioration, they will be referred to a local hospital."  (Ciliberti Decl. ¶ 11; Berger Decl. ¶ 9.)  "In testing for COVID-19," staff follow CDC's guidance "to safeguard those in its custody and care."  (Ciliberti Decl. ¶ 8; Berger Decl. ¶ 6.)   EDC and LPCC "staff have identified housing units for the quarantine of patients who are suspected of or test positive for COVID-19 infection." (Ciliberti Decl. ¶ 21; Berger Decl. ¶ 19.)

"In cases of known exposure to a person with confirmed COVID-19, asymptomatic detainees are placed in cohorts with restricted movement for the duration of the most recent incubation period (14 days after most recent exposure to an ill detainee) and are monitored daily for fever and symptoms of respiratory illness. . . . Those that show onset of fever and/or respiratory illness are referred to a medical provider for evaluation.  Cohorting is discontinued when the 14-day incubation period completes with no new cases.  Per ICE policy, detainees diagnosed with any communicable disease who require isolation are place[d] in an appropriate setting in accordance with CDC or state and local health department guidelines."  (Ciliberti Decl. ¶ 12; Berger Decl. ¶ 10.)  "The entire LPCC facility is cohorted . . . All detainees are cohorted in their respective housing units with meals being provided in the housing units and no inter-housing unit contact between detainees."  (Ciliberti Decl. ¶ 14.)

EDC and LPCC have clinic staff that "provide[] daily access to sick calls in a clinical setting, as well as mental health services and [has] the ability to admit patients at the local hospital for medical and mental health care."  (Ciliberti Decl. ¶ 13; Berger Decl. ¶ 11.)  EDC and LPCC "staff provide education on COVID-19 to staff and detainees to include the importance of hand washing and hand hygiene, covering coughs with the elbow instead of with hands, and requesting to seek medical care if they feel ill."  (Ciliberti Decl. ¶ 20; Berger Decl. ¶ 18.)

EDC and LPCC have "increased sanitation frequency and provide[] sanitation

supplies as follows:" (1) EDC provides disinfectant spray, hand sanitizer, soap, hot water, and gloves in every housing unit, and LPCC provides disinfectant spray, soap, and hot water in every housing unit; (2) in EDC and LPCC, "[t]he administration is encouraging both staff and the detention center general population to use [sanitation] tools often and liberally"; (3) EDC and LPCC provide "disinfectants to staff and cleaning crews and CDC recommended cleaning and disinfection above and beyond normal activity have been implemented"; and (4) EDC "provides hand sanitizer to detainees and staff and cleans and disinfects each housing unit between shifts and entire cell blocks on a rotational schedule," while "LPCC cleans and disinfects each housing unit between shifts and entire cell blocks on a rotational schedule." (Ciliberti Decl. ¶ 16; Berger Decl. ¶ 14.)

"The Department of Homeland Security has limited professional visits to noncontact visits and suspended in person social visitation and facility tours. The Department has required that all visitors wear personal protective equipment (PPE) to include mask, gloves and eye protection. No visitors are permitted to enter without the PPE." (Ciliberti Decl. ¶ 17.) EDC "staff are screening all facility staff and vendors when they enter the facilities including body temperatures" (Berger Decl. ¶ 16), and "LPCC is utilizing security staff medically trained to conduct temperature screening and health history questionnaires of all staff and vendors when they enter the facilities including body temperatures" (Ciliberti Decl. ¶ 18).

On April 28, 2020, pursuant to the order of preliminary injunction in *Fraihat v. ICE*, No. 5:19-cv-01546-JGB-SHK, 2020 WL 1932570 (C.D. Cal. April 20, 2020), ICE completed their review of all LPCC detainees "to identify and track detainees with Risk Factors for COVID-19. Further, for any detainees determined to be members of a defined class, ICE then conducted a new, individualized determination of their custody." (Doc. 49; *see also* Ciliberti Decl. ¶ 22 ("ICE has reviewed its detained 'at risk population' as identified by the CDC guidelines to determine if detention remains appropriate, considering the detainee's health, public safety and mandatory detention requirements, and adjusted custody conditions, when appropriate, to protect health, safety and well-being of

its detainees.").)

## II.     Proceedings

Petitioners-Plaintiffs ("Petitioners") Jhonnatan Brinez Urdaneta, Claudia Avalos Inchicaque, Miriam Gomez Cantillano, Noel Mejia Hernandez, Jose Vargas Saucedo, Bismer Rodriguez Alvarez, Landy Sanchez Ramos, and Geidys Calzadilla Borrero are current or former LPCC and EDC detainees who are currently awaiting a merits hearing, decision, or appeal on claims for asylum, withholding of removal, and/or protection under Article III of the United Nations Convention Against Torture.  (Docs. 1 ¶¶ 18-25; 30 at 4-6; 30-1 at 4-32.)  They each have one or more underlying medical conditions that place them at a high risk of severe illness and death were they to contract COVID-19: Urdaneta has a compromised immune system resulting from HIV and anemia secondary to bleeding hemorrhoids; Inchicaque suffers from asthma; Cantillano has type-2 diabetes, hypertension, and hyperlipidemia; Hernandez has a history of scoliosis and limited pulmonary functioning; Saucedo suffers from hypertension, hyperthyroidism, tachycardia, heart palpitations, obesity, a history of cardiovascular disease, and anxiety; Alvarez suffers from hypertension, asthma, and obesity; Ramos has diabetes with an episodic history of symptomatic hypoglycemia; and Borrero has a history of intermittent tachycardia, heart palpitations, and asthma.  (Lebensohn Decl. ¶ 4.)[20]

In their Petition, Petitioners name as Respondents-Defendants ("Respondents"): LPCC Warden Chuck Keeton; EDC Warden Fred Figueroa; Acting ICE Phoenix Field Office Director Albert Carter; ICE Assistant Field Office Directors Cesar Topete, Jason Ciliberti, and John Cantu; and Acting DHS Secretary Chad Wolf.

Petitioners claim that, in spite of the heightened risk of transmission of COVID-19 in detention facilities, Respondents have failed to put reasonable recommended policies and practices in place at LPCC and EDC to abate that risk, and instead, have created conditions that place Petitioners at a greater risk of exposure and inhibit their ability to

---

[20] Declaration of Patricia Lebensohn, M.D. (Apr. 1, 2020) ("Lebensohn Decl.") (Doc. 1-1 at 59-64.)

protect themselves.  Petitioners claim, and submit supporting declarations which show[21] that at the time of the filing of their Petition and Application, potential sources of transmission in LPCC and EDC had not been limited; legal representatives, government staff, detention officers, medical staff, and court staff were still permitted to enter and exit the facilities, come into close contact with detainees, and were either not required to wear, or not provided with, masks and other PPE to wear around detainees.  (Devaraj Decl. ¶ 7-8; Acosta Decl. ¶¶ 7, 21.)  Petitioners were unable to socially distance themselves from other detainees in LPCC and EDC; there were no limitations on the flow of detainees in either living quarters or common areas, and detainees were unable to maintain a 6-foot distance from others in their cells, bathrooms, dining halls, in lines, in medical settings, or during bus transfers.  (Acosta Decl. ¶¶ 6, 20, 22-23; Mahmoud Decl. ¶¶ 3-5, 7-11; Ferguson Decl. ¶¶ 7-9.)  Petitioners were also unable to practice safe hygiene in LPCC and EDC; detainees were provided only with limited shampoo or soap to shower, there was no hand sanitizer in the pods, and they were not provided with PPE to clean common areas or disinfectant to clean their cells.  (Acosta Decl. ¶¶ 4-5, 12, 15, 19; Mahmoud Decl. ¶ 14; Ferguson Decl. ¶¶ 7, 10.)  Further, detainees who exhibited symptoms of COVID-19 were not being screened, tested, or isolated, nor were they provided with medical attention and treatment.  (Acosta Decl. ¶ 8; Ferguson Decl. ¶ 5-6.)

Petitioners claim that their continued detention violates the Due Process Clause of the Fifth Amendment on three grounds: (1) Respondents have affirmatively placed Petitioners in danger by detaining them in conditions that risk their exposure to COVID-19, and have acted with deliberate indifference to that known and obvious danger; (2) Respondents, who have a "special relationship" with Petitioners that requires Respondents to provide them with reasonable medical care and safety, have detained

---

[21] Respondents do not substantively address or dispute the detainee accounts submitted by Petitioners but nonetheless appear to object to them because they are "hearsay declarations from telephone interviews with individuals who are or were detained at one of the facilities."  (Doc. 30 at 16, n. 4.)  Petitioners respond that the "detainee statements [were] taken via telephone due to the unavailability of in-person visits to detainees as a result of the COVID-19 pandemic."  (Doc. 35 at 2, n. 2.)  To the extent Respondents seek to exclude this evidence, their objection is overruled.  *See* Fed. R. Evid. 807.

Petitioners in conditions that put them at substantial risk of exposure to COVID-19 and of suffering serious harm; and (3) the conditions under which Petitioners are detained amount to punishment.

Petitioners ask the Court to: (1) issue a writ of habeas corpus ordering their immediate release from detention or, in the alternative, issue an injunction immediately enjoining Respondents from detaining them; (2) declare that "Respondents' continued detention in civil immigration custody of individuals at increased risk for severe illness, including persons with underlying medical conditions that may increase the risk of serious COVID-19," violates the Due Process Clause of the Fifth Amendment; (3) award reasonable costs and attorneys' fees pursuant to the Equal Access to Justice Act; and (4) grant any other and further relief that the Court deems just and proper.  They assert that this Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346, 1361, 2241, 1651, and 2201, 42 U.S.C. § 1983, and the Suspension Clause of the United States Constitution.

In response, Respondents argue that (1) Petitioners' claims are not cognizable because they challenge the conditions of their confinement, which cannot be remedied through a writ of habeas corpus; (2) Petitioners lack Article III standing; and (3) Petitioners' claims fail on the merits because, since the filing of their Petition and Application, Respondents have put reasonable recommended policies and practices in place at LPCC and EDC to avoid the risk of widespread transmission of COVID-19. (Docs. 30-31.)

## III.   Discussion

### A.   Cognizability

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where a petitioner is "in custody under or by color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §§ 2241(c)(1), (3).  "The writ of habeas corpus historically provides a remedy to non-citizens challenging executive detention."  *Trinidad y Garcia v. Thomas*, 683 F.3d

952, 956 (9th Cir. 2012).  *See also Munaf v. Geren*, 553 U.S. 674, 693 (2008); *Allen v. McCurry*, 449 U.S. 90, 98 n.12 (1980).  Generally, "[c]hallenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus," whereas a civil rights action is the proper channel for "requests for relief turning on circumstances of confinement."  *Muhammad v. Close*, 540 U.S. 749, 750 (2004); *see Hill v. McDonough*, 547 U.S. 573, 579 (2006); *Nelson v. Campbell*, 541 U.S. 637, 643 (2004).

While general practice has counseled against it, the Supreme Court has not explicitly foreclosed the use of habeas corpus for conditions-of-confinement claims.  *See Ziglar v. Abbasi*, 582 U.S. ___, 137 S. Ct. 1843, 1862 (2017) (leaving open the question of whether alien detainees challenging "large-scale policy decisions concerning the conditions of confinement imposed . . . might be able to challenge their confinement conditions via a petition for a writ of habeas corpus"); *Boumediene v. Bush*, 553 U.S. 723, 792 (2008) (declining to determine "the reach of the writ with respect to claims of unlawful conditions of treatment or confinement"); *Bell v. Wolfish*, 441 U.S. 520, 526, n. 6, (1979) (leaving for "another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement").  Because Petitioners claim that their continued detention under the present conditions is unconstitutional and that their immediate release is the only effective remedy (*see e.g.,* Doc. 1 ¶ 14), Petitioners' claims can be viewed as challenging the fact, not simply the conditions, of their confinement.  *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (where an individual is "challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release," the proper remedy is a writ of habeas corpus).  The fact that Petitioners' claims require consideration of detention conditions does not necessarily preclude habeas corpus review.  Therefore, in the absence of clear or binding authority to the contrary, these claims are cognizable under § 2241.

Even if the Court were to lack jurisdiction to review Petitioners' claims under § 2241, Petitioners have alternatively pleaded a cause of action under the Fifth Amendment for injunctive and declaratory relief, over which the Court would have jurisdiction under

28 U.S.C. § 1331, as an equitable cause of action under the Constitution. *See Ziglar*, 137 S. Ct. at 1865 (observing that alien detainees challenging their conditions of confinement could seek "an injunction requiring the warden to bring his prison into compliance with the regulations discussed above [] or some other form of equitable relief"); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15-16 (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Sierra Club v. Trump*, 929 F.3d 670, 694 (9th Cir. 2019) (federal courts have equitable authority to grant injunctive relief "against federal officials violating federal law"); *Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 861 (9th Cir. 1992) ("Federal courts possess whatever powers are necessary to remedy constitutional violations because they are charged with protecting these rights.").

## B.   Justiciability

"Article III of the Constitution limits the judicial power of the United States to the resolution of 'Cases' and 'Controversies,' and 'Article III standing . . . enforces the Constitution's case-or-controversy requirement.'" *Hein v. Freedom from Religion Found, Inc.*, 551 U.S. 587, 597-98 (2007) (*quoting DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 589 (2006)). Article III standing is comprised of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). First, the petitioner "must have suffered an injury in fact-an invasion of a legally protected interest." *Lujan*, 504 U.S. 560. "An injury sufficient to satisfy Article III must be 'concrete and particularized' and 'actual or imminent,' not 'conjectural' or 'hypothetical.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (*quoting Lujan*, 504 U.S. at 560). Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560. And third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561.

Respondents argue that Petitioners lack standing because their asserted injury is neither actual nor concrete.  Respondents maintain that the threat of exposure *itself* is purely speculative because they have "taken significant precautionary steps at [LPCC] and EDC to prevent an outbreak of COVID-19," which they claim is made evident by the lack of current positive confirmed cases in either LPCC or EDC.[22]  This argument lacks merit.  No one disputes that COVID-19 exists, that it is rapidly and pervasively spreading, that detention facilities face an acute risk of disseminating infectious diseases*,* or that individuals in ICE custody have contracted COVID-19.  The threat of exposure in LPCC and EDC is not theoretical.  To that end, without providing the current populations or the number of tests performed in LPCC and EDC, the number or absence of confirmed positive cases offers no insight into the degree to which the disease has or may spread throughout the facilities, much less whether Respondents' practices have served to prevent or contain further transmission.

Petitioners need not have sustained a serious illness, contracted the disease, much less await the escalation of COVID-19 in their detention facilities to demonstrate standing.  They need only demonstrate that "the threatened injury is 'certainly impending,' or there is a "substantial risk that the harm will occur."  *Driehaus*, 573 U.S. at 158; *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("a remedy for unsafe conditions need not await a tragic event").  As discussed below, Petitioners have done so.

Respondents also argue that Petitioners' alleged injury is not redressable because "no court order can prevent [them] from being exposed to the risk of infection within whatever Arizona community [they] might enter."  (Doc. 30 at 15.)  This too fails.  Petitioners do not ask the Court to enjoin their exposure to COVID-19.  They ask that they not be involuntarily detained under conditions which unreasonably increase the likelihood that they will be exposed.  That is redressable by this Court.

However, insofar as Petitioners Urdaneta, Inchicaque, Cantillano, Saucedo,

---

[22] At the time of their Response, no individual at EDC had been confirmed positive, and only two individuals had been confirmed positive at LPCC, both of which had fully recovered.  (*See* Doc 30 at 19; Ciliberti Decl. ¶ 14(b).)

Alvarez, Ramos, and Borrero have since been released from custody (*see* Docs. 9, 17, 24, 33, 40, 43), their claims are now moot because they have obtained the relief sought in this case. These Petitioners therefore no longer have standing, and the Petition will be denied in part without prejudice as to their claims. Accordingly, the Court turns to the merits of the claims as they relate to the remaining Petitioner in this case, Hernandez, who remains detained in LPCC.[23]

### C.    Merits

The Fifth Amendment's Due Process Clause prohibits the federal government from depriving "any 'person . . . of . . . liberty . . . without due process of law,'" and its protections extend "to all 'persons' within the United States, including aliens." *Zadvydas v. Davis*, 533 U.S. 678, 690, 693 (2001). Freedom from physical restraint falls at the core of the liberty interest protected from arbitrary governmental action by the Due Process Clause. *Youngberg v. Romeo*, 102 457 U.S. 307, 316 (1982). And where pretrial detention is incident to legitimate government objectives, a detainee has a protected liberty interest in freedom from punishment absent an adjudication of guilt. *Bell*, 441 U.S. at 534.[24] The government deprives a detainee of this substantive liberty interest without due process when it detains them under conditions that "amount to punishment." *Bell*, 441 U.S. at 535. Conditions resulting in harm or "disability" amount to punishment if (1) they are expressly imposed for the purpose of punishment, (2) they are not "rationally related to a legitimate

---

[23] "ICE determined that [Petitioner] Hernandez was a class member under *Fraihat*" and, on or around April 28, 2020, "conducted a new, individualized custody determination, which was based on guidance previously promulgated on April 4, 2020, and included in the *Fraihat* order. As a result of a new custody determination, ICE concluded that [Petitioner] Hernandez's custody conditions will not change." (Doc. 49.)

[24] Petitioners do not challenge Respondents' purpose for detaining them in the first instance, specifically, to ensure their presence for removal proceedings or to execute a final order of removal. *See Jennings v. Rodriguez*, 583 U.S. ___, 138 S. Ct. 830, 836 (2018); *Demore v. Kim*, 538 U.S. 510, 520-22 (2003); *Zadvydas*, 533 U.S. at 690-91. Therefore, in light of *Kingsley, infra*, and subsequent Ninth Circuit precedent, Petitioners' three due process claims are best understood as arising from the liberty interest in being free from punishment. *See Bell*, 441 U.S. at 534 ("what is at issue when an aspect of pretrial detention that is not alleged to violate any express guarantee of the Constitution is challenged, is the detainee's right to be free from punishment")*; Schall v. Martin*, 467 U.S. 253, 269 (1984); *Youngberg*, 457 U.S. at 316 (it is "unconstitutional to confine the [civilly] committed—who may not be punished at all—in unsafe conditions").

nonpunitive governmental purpose," or (3) they "appear excessive in relation to" a legitimate governmental purpose.  *Bell*, 441 U.S. at 538-39, 561; *see also Kingsley v. Hendrickson*, 576 U.S. 389, 135 S. Ct. 2466, 2473 (2015) (government action amounts to punishment if it is "objectively unreasonable").

The government has legitimate interests stemming from its need to manage a detention facility that may justify imposed conditions, such as preserving internal order and maintaining institutional security.  *Kingsley*, 135 S. Ct. at 2473 (citing *Bell*, 441 U.S. at 540).  The government also has a responsibility, and thereby, a legitimate interest in providing for the basic human needs of the detainees held within its custody, such as food, clothing, shelter, medical care, and reasonable safety.  *DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 200 (1989).  Therefore, conditions which pose an objectively unreasonable and substantial risk of serious harm to detainee health or safety are not rationally related to a legitimate nonpunitive government purpose.  *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1085 (9th Cir. 2016) (IKUTA, J., dissenting) ("objectively unreasonable action has no legitimate nonpunitive governmental purpose") (citing *Kingsley*, 135 S. Ct. at 2473)); *Farmer v. Brennan*, 511 U.S. 825, 833 (1994) ("gratuitously" allowing violence among prisoners "serves no legitimate penological objective" (internal bracket and citation omitted)); *Whitley v. Albers*, 475 U.S. 312, 320 (1986) (the government's "responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities"); *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (the denial of medical care which results in pain and suffering does not "serve any penological purpose").[25]

In the Ninth Circuit, to prevail on a claim of unconstitutionally punitive conditions

---

[25] Although *Farmer, Whitley,* and *Estelle* centrally concern Eighth Amendment prison condition claims, which involve constitutional standards and considerations that differ from those at issue here, they are relevant insofar as they identify action which serves legitimate institutional objectives, and inaction which clearly does not.  *See Ziglar,* 137 S. Ct. at 1877 (BREYER, J., dissenting) ("the Eighth Amendment's Cruel and Unusual Punishment Clause . . . applies to convicted criminals while the [the Fifth Amendment's Due Process Clause] applies to pretrial and immigration detainees"); *see also Youngberg*, 457 U.S. at 322 (persons in civil custody "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish").

of confinement under the Due Process Clause of the Fifth Amendment,[26] a detainee must show:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Castro*, 833 F.3d at 1069, 1070-71 (applying the objective standard in *Kingsley* to failure-to-protect claims); *see also Smith v. Washington,* 781 Fed. App'x 595, 597 (9th Cir. 2019) (applying *Castro* standards to conditions of confinement claims); *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018) ("extending the objective deliberat[]e indifference standard articulated in *Castro* to medical care claims"); *Wilson v. Seiter,* 501 U.S. 294, 303 (1991) (finding no significant distinction between claims alleging inadequate medical care, failure-to-protect, or denial of other conditions of basic necessity). "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily 'turn[ ] on the facts and circumstances of each particular case.'" *Castro*, 833 F.3d at 1070 (quoting *Kingsley*, 135 S. Ct. at 2473).

### 1.   Substantial Risk of Serious Harm

The record shows, and the parties do not dispute, that individuals within detention facilities have a heightened risk of contracting and transmitting COVID-19, and individuals with certain underlying medical conditions face a high risk of severe illness or death if they contract COVID-19. (*See, e.g.,* CDC Guidance at 2; ICE PRR at 3.) It is also undisputed that because of those risks, detention facilities must implement measures to avoid and limit the spread of COVID-19. (*See* ICE PRR at 4 ("Given the seriousness and pervasiveness of COVID-19, ICE is taking necessary and prompt measures in response" and "is providing

---

[26] Due process claims brought under the Fifth and Fourteenth Amendments are analyzed under the same standard. *See Paul v. Davis*, 424 U.S. 693, 702 n.3 (1976).

guidance on the minimum measures required for facilities housing ICE detainees to implement to ensure consistent practices throughout its detention operations and the provision of medical care across the full spectrum of detention facilities to mitigate the spread of COVID-19."), 15 ("the facility must be especially mindful of cases that are at higher risk of severe illness from COVID-19" and "make all possible accommodations . . . to prevent transmission of other infectious diseases to the higher-risk individual").

Absent specific measures which safeguard high-risk detainees, or other measures which reasonably prevent and manage detainee exposure to COVID-19, the unmitigated risk of transmission in detention facilities yields a substantial risk of severe illness or death to high-risk detainees.  Because reasonable measures have not been implemented in LPCC to limit the risk of Petitioner's exposure, *see infra,* and the parties do not dispute that Petitioner has a medical condition which places him at high-risk of severe illness or death,[27] the conditions under which Petitioner is detained poses a substantial risk of serious harm to his health and safety.

### 2.     Intentional Decision

Respondents have made an intentional decision with respect to the conditions under which Petitioner is detained by failing to implement responsive measures specific to high-risk detainees in LPCC, despite knowledge of the acute risks posed to them.  *See Castro*, 833 F.3d at 1070 (a failure to act with respect to a known condition may constitute an intentional decision).   While Respondents have been "regularly updating infection prevention and control protocols" since the "onset of reports" of COVID-19, and have reviewed the detained "at risk population" to determine if detention remains appropriate, they have not promulgated or implemented *any* explicit measures in LPCC concerning the care of high-risk detainees who they have determined should remain detained.[28]

---

[27] Petitioner Hernandez has "severe scoliosis of the back . . . that is so prominent that it mechanically interferes with his breathing ability . . . On physical exam . . . he had fine crackles in his left upper lung field and no audible lung sounds at the left posterior middle or lower lung fields." [] Hernandez is at increased risk of severe pulmonary infection should he contract COVID-19."  (Lebensohn Decl. ¶ 4(b).)

[28] Indeed, *Fraihat, supra*, the district court ordered ICE to "promptly issue a

### 3.       Objective Unreasonableness

While Respondents have taken some action in LPCC to prevent and mitigate the spread of COVID-19 (*see* Ciliberti Decl., *supra*), these actions have not included reasonable, necessary, and available measures to abate the risk of harm to Petitioner and other high-risk detainees.

First, while both CDC and ICE guidance observe that social distancing is essential to preventing and reducing transmission of COVID-19, Respondents have pointed to *no* specific measure that has been taken in LPCC to facilitate social distancing among detainees.  (*Cf.* ICE PRR at 13 ("Although strict social distancing may not be possible in congregate settings such as detention facilities, all facilities housing ICE detainees should implement [listed social distancing] measures").)[29]  For example, Respondents do not identify any measures they have taken to reduce the overall population in LPCC to provide greater spacing among high-risk detainees.  (*See* ICE PRR at 13 (facilities "should implement . . . measures to the extent practicable . . . to reduce the population to approximately 75% of capacity").)[30]  Respondents merely state that LPCC is "not overpopulated" without any discussion of whether the current population makes social distancing feasible.

Respondents have not identified any measure taken in LPCC that would allow high-risk detainees to maintain six feet of distance from other detainees in their cells, in dining areas, in lines, in medical clinics, or in any other detained space.  Respondents state only that all detainees in LPCC are cohorted and have their meals delivered to their units.

---

performance standard or a supplement to their Pandemic Response Requirements . . . defining what the minimum acceptable detention conditions for detainees with the Risk Factors, regardless of the statutory authority for their detention, to reduce their risk of COVID-19 infection pending individualized determinations or the end of the pandemic."

[29] Notably, Respondents attach a copy of the ICE PRR to their response, but do not discuss what, if any, specific measures *have been* implemented in LPCC in accordance with that guidance.

[30] *See* n.15, *supra* (ICE has "decided to reduce the population of all detention facilities to 70 percent or less to increase social distancing. Detention facilities may also increase social distancing by having staggered meals and recreation times in order to limit the number of detainees gathered together. All community service projects are suspended until further notice.").

Cohorting, however, is not a social distancing measure.  And, in the absence of uniform testing of *all* detainees, cohorting is not a reasonable substitute for social distancing measures.  (*See* ICE PRR at 11 ("Because many individuals infected with COVID-19 do not display symptoms, the virus could be present in facilities before cases are identified . . . social distancing [is] critical in preventing further transmission"); *id.* at 14 ("Cohorting should only be practiced if there are no other available options."); CDC Guidance at 16, 20 ("If cohorting is unavoidable, [facilities should] make all possible accommodations to reduce exposure risk for the higher-risk individuals . . . For example, [facilities should] allocate more space for a higher-risk individual within a shared medical isolation space" or "intensify social distancing strategies for higher-risk individuals.").)  Further, because Respondents have not identified specific practiced measures for identifying, screening, and testing existing symptomatic detainees in LPCC, it is not evident that cohorting has any preventative or remedial value.  For example, Respondents state that LPCC detainees "who present symptoms compatible with COVID-19 will be placed in isolation" and tested, but do not identify which symptoms prompt screening, whether non-quarantined detainees are monitored for those symptoms, or what, if any, system is in place for reporting those specific symptoms.

Second, while both CDC and ICE guidance state that good hygiene practices are critical to preventing and limiting transmission, Respondents have not identified measures they have taken in LPCC to adequately facilitate safe hygiene among high-risk detainees.  Respondents state that LPCC provides "sanitation" supplies to housing units, but do not identify the frequency or quantity of supplies that are provided to detainees, much less high-risk detainees.  (*See* ICE PRR at 7, 9 ("*all detention facilities housing ICE detainees must* . . . [p]rovide detainees and staff no-cost, unlimited access to supplies for hand cleansing, including liquid soap, running water, hand drying machines or disposable paper towels" and "provide and restock hygiene supplies throughout the facility") (emphasis in original).)  "[E]ncouraging both staff and the detention center population to use [sanitation] tools often and liberally" (Ciliberti Decl. ¶ 16) is not a reasonable preventative measure

unless Respondents provide LPCC staff and detainees with frequent and liberal access to sanitation supplies. In the absence of any statement or evidence controverting the detainee accounts provided by Petitioners, *see supra*, the record supports the inference that Respondents have not done so.[31]

Third, Respondents have not identified any measures they have taken in LPCC involving PPE or cloth face coverings to protect high-risk detainees from contagious detainees and staff. Respondents only require that "visitors" in LPCC, who are limited to noncontact visits, must wear PPE. (Ciliberti Decl. ¶ 17.) Indeed, Respondents do not point to any requirement that masks of any kind be provided to detainees or staff or that masks be worn by staff when interacting with high-risk detainees. (*Cf.* ICE PRR at 8-9 ("Cloth face coverings should be worn by detainees and staff (when PPE supply is limited) to help slow the spread of COVID-19").)

### 4. Causation

Despite knowledge of the serious risks posed to vulnerable detainees by COVID-19, and knowledge of Petitioner's high-risk medical conditions, Respondents have not implemented recommended or required measures through which Petitioner could maintain a safe distance from other detainees who may or may not be contagious; measures that would provide Petitioner with the ability to adequately clean and disinfect himself and his immediate surroundings if exposed; measures that would provide Petitioner with the means to protect himself from exposure during his interactions with staff; or measures that would allow Petitioner to seek medical care without risking further exposure, or that would ensure that he receive prompt and adequate medical attention. Respondents do not claim that

---

[31] Petitioners have also attached to their Reply additional recent declarations which report that LPCC detainees do not have unlimited access to hygiene supplies and have only limited access to disinfectants. *See* Declaration of Yesenia Ramales Ferguson on behalf of Noel Francisco Mejia Hernandez (Apr. 16, 2020) ¶ 11 (Doc. 35-1 at 42-43) (in LPCC Hopi Alpha unit, detainees do not have access to hand soap or hand sanitizer, and have limited access to disinfectant); Declaration of Jhonnatan Brinez Urdaneta (Apr. 16, 2020) ¶ 11 (*id.* at 45-50) (in LPCC Apache Delta unit, detainees were provided with shampoo to shower, but are not provided with free soap or hand sanitizer, which must be purchased at commissary); Declaration of Bismer D. Rodriguez Alvarez (Apr. 15, 2020) ¶ 10 (*id.* at 52-58) (in LPCC Apache Delta unit, detainees were provided only with shampoo for showering).

1   measures facilitating social distancing, hygiene, self-protection, and medical care are

2   unreasonable or unnecessary for preventing and managing transmission of COVID-19, nor

3   do they claim that these measures are not feasible or that they are incompatible with LPCC

4   operations.

5          By failing to take these recommended, reasonable, and available measures,

6   Respondents have fostered conditions that pose an objectively unreasonable risk of

7   transmission of COVID-19 and a resulting substantial risk of serious harm to Petitioner's

8   health and ultimate safety.   While Respondents may have legitimate objectives for

9   detaining Petitioner, they have identified no single legitimate purpose served by detaining

10  Petitioner under conditions that pose an objectively unreasonable risk of harm to him.   That

11  is because these conditions serve no legitimate government objective.   The conditions

12  under which Petitioner is detained therefore amount to punishment and violate the Due

13  Process Clause of the Fifth Amendment.

14         **D.     Relief**

15         At this stage, the Court is unable to conclude that there is no set of conditions short

16  of release that would be sufficient to protect Petitioner's constitutional rights.   Instead, the

17  Court concludes, *at this time*, that the appropriate remedy is to require Respondents to

18  immediately place Petitioner under constitutionally adequate conditions.   *See Ziglar*, 137

19  S. Ct. at 1863 ("A successful habeas petition would have required officials to place

20  respondents in less-restrictive conditions immediately"); *Preiser*, 411 U.S. at 499 ("it is

21  arguable that habeas corpus will lie to remove the restraints making custody illegal").

22         The Court will require each party to submit a proposed form of order setting forth

23  measures to be implemented with respect to Petitioner that are consistent with CDC and

24  ICE guidelines, relevant to the care of high-risk detainees, and reasonable to the

25  circumstances presented.   For example, proposed measures might include placing

26  Petitioner in a single-occupancy cell; having Petitioner's meals delivered to his cell;

27  providing Petitioner with accommodations to bathe and shower in isolation; providing

28  Petitioner without charge, PPE, unlimited hygiene supplies and disinfectant supplies for

his cell; requiring that all staff and officers wear masks when interacting with Petitioner; and requiring that Petitioner receive scheduled medical examinations, testing, and/or treatment.  The proposed form of orders shall not be treated as a waiver of any claim or defense raised in this action, and they may not include any legal argument or request for the Court.

**IT IS ORDERED:**

(1)   The parties shall have until **May 13, 2020** to each submit a proposed form of order consistent with this decision.

(2)   The Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 and Complaint for Injunctive and Declaratory Relief (Doc. 1) is **denied in part** as to claims brought on behalf Petitioners Urdaneta, Inchicaque, Cantillano, Saucedo, Alvarez, Ramos, and Borrero, without prejudice to these Petitioners renewing their requests for relief in this action should they be re-detained.  The Petition is **granted in part** as to Petitioner Noel Mejia Hernandez (A# 203-702-428), as set forth by separate order to be issued following the filing of the parties' proposed form of orders.

(3)   The unopposed Motion for Leave to File an Amicus Curiae Brief (Doc. 26) is **granted**.  The Clerk of Court shall file the lodged proposed Brief (Doc. 27).

(4)   The Application for Temporary Restraining Order and Order to Show Cause Regarding Preliminary Injunction (Doc. 19) and Request for Status Conference (Doc. 45) are **denied without prejudice as moot**.

Dated this 11th day of May, 2020.

Honorable Steven P. Logan
United States District Judge